AUGUSTA N. AHRENS

*v.*

MARY KELLY et al.

[Decided July 31st, 1917.]

1. Where a son executed a second mortgage and his mother signed the bond accompanying it, and the property was conveyed to her, on foreclosure of the first mortgage the mother can set up the defence of usury.

2. Although the illegal bonus was paid to another, if paid pursuant to the contract of loan, with the knowledge of the mortgagee, the mortgage is usurious.

3. The evidence in this case shows that the mortgagee knew that the loan was usurious.

---

On bill, &c.

*Messrs. Roe, Runyon & Autenreith* (by *Mr. Henry W. Runyon*), for the complainant.

*Mr. Randolph Perkins,* for the defendants.

.LEWIS, V. C.

The bill in this case is filed to foreclose a mortgage made by the defendant Patrick J. Kane, and Esther Kane, his wife, to William G. Ahrens. The instrument bears date the 7th day of March, 1913, and covers property at the corner of Bergen and Bramhall avenues, Jersey City. The mortgage was for the sum of $10,000, and was second to one held by the New Jersey Title Guarantee and Trust Company for $23,000. Kane used the money (*i. e.,* the $8,000 of the $10,000 paid on the mortgage) in erecting an apartment-house, and also secured other sums from his mother, Mary Kelly, who executed the bond accompanying the mortgage. On May 21st, 1913, he conveyed the property to his mother and they both testify that at the time of this conveyance there was an agreement between them that the mother would turn back the property to her son upon being reimbursed.

An answer and counter-claim were filed alleging that the transaction was usurious, but it was urged by the complainant that even if this were the case, under the rule laid down in *Lee* v. *Stiger, 30 N. J. Eq. 610; Scull* v. *Idler, 79 N. J. Eq. 466,* and other cases, Mary Kelly, the defendant, could not be allowed to set up usury against such mortgage. I am not inclined to this view of the matter under consideration. This is not the case of affording to a "mere adventurer who may happen to slip into the seat of the borrower, a right to speculate on a violation of law which has done him no harm," as was said in *Lee* v. *Stiger.* That Mrs. Kelly took the conveyance expressly subject to the mortgage is a mere technical defence. Mrs. Kelly signed the bond and is liable for deficiency judgment thereon. She really took the deed as security for her loan, and under the view expressed in *Truesdell* v. *Bowden, 47 N. J. Eq. 396,* is entitled to defend. Kane, the son and mortgagor, is also a party to this suit,

and he certainly has, under *Andrews* v. *Stelle, 22 N. J. Eq. 478*, this right.

It was further contended that in case the transaction was tainted with usury, Albanesius, who negotiated the loan, was the agent of Kane, and not of Ahrens, the complainant, and that he (Ahrens) knew nothing about the arrangement between Kane and Albanesius, and that if the former had any remedy it was by suit against the latter for illegal brokerage. The facts developed at the hearing satisfied me that the complainant, Ahrens, knew all about the Kane transaction with Albanesius, and that he must be held accountable within the rule laid down by Vice-Chancellor Van Fleet in *Borcherling* v. *Trefz, 40 N. J. Eq. 502*, "that to taint a contract with usury it is not necessary that the illegal interest or bonus shall have been taken by the lender himself, but if it be shown that the illegal consideration was paid to some other person than the lender, pursuant to the terms of the contract of loan, with the knowledge of the lender, the contract must be declared usurious." This view has been numerously followed. Kane says that Ahrens was present at the time of the first payment; that he saw the two checks that were left lying on the desk and the one check that was taken. Ahrens did not go on the stand and deny this. The testimony relative to his exaction of a bonus from the owner for an extension of the mortgage and his demand for another that he did not get, gives us some idea as to his disposition regarding transactions of this kind. Moreover, it does not seem probable that he would have loaned this considerable sum of money on second mortgage to a person of Kane's financial standing, merely to secure interest, without a thorough understanding. He is too shrewd a business man to do this.

The division of the first payment of $4,000 into three parts— $2,000, $1,500 and $500—and the giving of the three checks is suggestive. Kane's story is that Ahrens produced the three checks. He says that Ahrens had already told him he would have to pay a bonus of $2,000 to get the $10,000. His story is that the checks were laid upon the table in Albanesius's office; that he endorsed them there and left the $1,500 check and the $500 check lying on the desk in the presence of Albanesius and

Ahrens. The $2,000 check he took and deposited in the New Jersey Title Guarantee and Trust Company, as is shown by his pass-book. This story appears to me to be a truthful narration of events at the outset of the transaction. Can it be doubted that Ahrens saw the endorsement of Albanesius on the two checks, one for $500 and the other for $1,500? Albanesius denies Kane's story. But, as I said before, Ahrens did not do this. Albanesius says that the arrangements with Kane were all made before Ahrens was brought in. Albanesius says that he had many financial transactions with Kane; that Kane gave him a note of $1,500 which he held at the time of the first payment on the Ahrens mortgage; that the check of $1,500 was taken by him in payment of this note, and that the $500 check was for securing the loan for Kane, which, of course, is $350 beyond what the law allows for brokerage. Albanesius also says that Kane's indebtedness arose by cash-money loan transactions. He was subpœnaed to produce all his books, papers and checks of every description pertaining to the transaction, but he did not produce any. Subsequently, while on the witness stand, upon his attention being directed to the matter, Albanesius produced a note of $1,500, signed by Kane, which he says he has held since the time of the first payment, although he alleges it was paid by Kane with the $1,500 check he received on the first payment. Kane says that at the time of the first payment Albanesius asked him to sign the $1,500 note so as to cover up the transaction, and that he owed no money whatever to him; that he never borrowed a cent from him and never had any dealings with respect to money. From the evidence before me it is quite apparent that it would be hard for Albanesius to prove the consideration of this note for $1,500.

It is difficult for me to disconnect Albanesius and Ahrens in this transaction. They were neighbors and friends, and had been for years; and the testimony is that they called each other "Dick" and "Bill," and that they had several financial transactions together, and at the time of the hearing Ahrens was renting and living in a house belonging to Albanesius, and Ahrens had a mortgage on Albanesius's property for an amount in the

neighborhood of $40,000. It is inconceivable that he did not discuss with his friend the nature of the transaction that he had on ·hand with Kane. It is also observable from the testimony of Ahrens, Rita Smith and the complainant, that Ahrens had every intention of exacting from Mrs. Kelly all he could get in the way of bonuses for extensions. He admits that he got $400 of the $500 check which was paid for the renewal of the mortgage, and there is no denial that when the mortgage fell due another bonus of $500 was demanded. We have a similar situation throughout the entire life of the mortgage. Miss Smith was a mere dummy in the transaction. On September 8th, 1914, when a half year's interest was paid, Ahrens told Mrs. Kelly that he wanted the principal. She urged him to let the mortgage stand, and he said that he had a friend who might take it, providing the bonus of $500 was paid. On September 14th, Mrs. Kelly paid the bonus. As before stated, Ahrens admits that he got $400 of it. On that day Ahrens executed an assignment of the mortgage to Rita B. Smith, which was recorded. Rita B. Smith immediately executed an assignment to Ahrens' sister, Augusta N. Ahrens, although this assignment has never been recorded. Ahrens' testimony is that his sister had $2,000 interest in the mortgage from its inception. Mrs. Kelly paid interest on March 7th, 1915, and September 7th, 1915, to Miss Smith. When the last interest was paid, the mortgage became due, and Mrs. Kelly asked Miss Smith to grant her a further extension, but Miss Smith refused. On October 30th, 1915, she sent the following. letter to Mrs. Kelly:

*"Dear Madam:*

"I had to have some money and have sold the mortgage I held on your Bergen avenue and Bramhall avenue property to Miss A. N. Ahrens.
                    "Respectfully,
                                        "Rita B. Smith."

Miss Smith's evidence, and her attitude while on the witness stand, satisfactorily shows that she had absolutely no interest whatever in the mortgage, but was merely acting for Ahrens. She was in ignorance of the entire matter and did what she was told to do.

On the brief it is urged by the complainant that the answer is defective. The counter-claim charges usury, and the particulars of the transaction are .set out in the answer. My recollection is that the solicitor of the defendants made application to amend the answer, so that it might conform with the proofs and meet the views expressed by Vice-Chancellor Emery in *Kase* v. *Bennett, 54 N. J. Eq. 97,* and that leave to do this was granted.

In this case the usury charged appears by the facts as well as by the conclusions of law from the facts. *Durant* v. *Banta, 27 N. J. Law 624.* The usury is proven, not left to conjecture. *New Jersey Patent Tanning Company* v. *Turner, 14 N. J. Eq. 326.* I cannot fairly and reasonably infer that this was not a usurious transaction. *Gillette* v. *Ballard, 25 N. J. Eq. 491; affirmed, 27 N. J. Eq. 489.*

The complainant in this case is entitled to a decree for the amount of the principal of this mortgage less the usurious charges at the time of its inception. The bonuses paid on the renewal September 14th, 1914, must be applied to the principal.